IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
JUNE 18, 2008 Session

## ANNETTE CECILIA BLAKES v. NICHOLAS J. SIMS

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-001893-04      Rita L. Stotts, Judge**

_____

**No. W2007-02129-COA-R3-CV - Filed December 5, 2008**

_____

In this appeal, we are asked to determine whether the trial court erred: (1) in modifying the Parties'
Final Decree of Divorce absent proof of a material change in circumstances affecting the best interest
of the Parties' child; (2) in making temporary modifications to the Final Decree of divorce absent
clear and convincing proof that the child was being harmed or would be harmed in the situation that
existed when the modifications were made; and (3) in finding that Father's motives for relocating
were vindictive, and in its concerns about Father's willingness to comply with future court orders
or to provide for the child.  We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and
WALTER C. KURTZ, SR. J., joined.

David R. Huggins, Memphis, TN, for Appellant

Mitchell D. Moskovitz, Memphis, TN, Karen B. Hall, Cordova, TN, for Appellee

**OPINION**

# I. FACTS & PROCEDURAL HISTORY

On November 7, 2003, Nicholas J. Sims ("Appellant" or "Father") and Annette Cecilia Blakes ("Appellee" or "Mother") (collectively, the "Parties") were divorced, pursuant to a Final Decree of Divorce ("Final Decree") entered in the Harris County, Texas, Circuit Court. Under that Decree, Father was appointed as the sole managing conservator of the Parties' only child, Maxwell Nathan Sims, ( "Child") born October 1, 2002, and Mother was provided certain visitation. Further, it set forth a detailed parenting schedule and ordered that the primary residence of the child should be Shelby County, Tennessee. The Final Decree did not provide any findings of fact.

Mother filed a Petition to Enroll Foreign Decree of Divorce in the Shelby County Circuit Court on April 2, 2004. After Father's initial objection to Mother's Petition, the Parties submitted a Consent Order on Enrollment of Foreign Decree of Divorce, which was entered on June 25, 2004. On July 15, 2004, Mother filed a Petition to Modify Final Decree of Absolute Divorce in the Shelby County Circuit Court alleging that "a substantial and material change of circumstances" existed such that Mother should be designated as the primary residential parent, including that:

> [S]ince entry of the [Final Decree] Father has failed or is unable to properly care for the minor child.
> [Also,] Father is physically and emotionally unstable, [and] is unemployed or under-employed even though he holds advanced M.B.A. and J.D. degrees and . . . his health has deteriorated since entry of the final decree. Father has exhibited bizarre behavior, displays a handicap parking permit, appears not to be gainfully employed, and does not appear to be largely responsible for the minor child. Rather, Father allows his mother, the child's grandmother, to primarily parent the child[.]

Father then filed a Motion to Require Forensic Psychological Evaluation, asserting that Mother's "mental condition . . . is in controversy [and that Mother] is mentally and emotionally unstable." Father contended that Mother had ignored the Texas court's order to submit to a psychological evaluation, while Father had allowed an evaluation of himself on June 17 and 18, 2003. After Mother's Response, the trial court ordered both Parties to submit to psychological custody evaluations to be performed, by agreement of the Parties, by Dr. Fred Steinberg.

Subsequently, Mother filed a Motion for Extended Holiday Parenting Time on October 15, 2004. Under the Texas Final Decree, Mother was allowed visitation with the Child from 4:30 PM until 8:00 PM on Thanksgiving Day and 3:00 PM until 8:00 PM on Christmas Day. Over Father's Motion to Dismiss on the Pleadings, in which he claimed that Mother had failed to allege a change of circumstances since the Final Decree's entry, the trial court entered an Order extending Mother's Thanksgiving visitation from Thursday, November 25, 2004 at 4:00 PM until Friday, November 26, 2004 at 12:00 PM. Likewise, the trial court extended Mother's Christmas visitation from 5:00 PM December 25th until 7:30 PM on December 29, 2004. Following a June 27, 2005 hearing, the trial

court entered an Order on Temporary Parenting Plan and Referring Matter for Mediation on July 15, 2005, establishing a weekly rotation of parenting time. On November 30, 2005, Father filed a Petition for Parental Relocation, requesting leave of the trial court to relocate with the Child from Memphis to Washington, D.C., as father had gained employment with the Federal Bureau of Investigation (FBI). [1] Subsequently, the trial court entered Orders setting forth temporary parenting plans for the months of January and February 2006. Then, on April 24, 2006, the trial court entered an Order Modifying Temporary Parenting Plan, designating Mother as primary residential parent and establishing a system whereby the Child would live with each Party on a six-month rotation. The court based its ruling on a finding that Father's attempt to relocate with the Child to Washington, D.C. was vindictive, under Tennessee Code Annotated section 36-6-108(d)(1)(C), and that it was in the Child's best interest "to have both parents spending as much time as possible with him." A June 16, 2006 Temporary Parenting Plan Order was entered, further detailing the terms of the six-month rotating parenting plan, and naming Father as the primary residential parent through December 31, 2006.

Finally, on August 14, 2007, the trial court entered a permanent Parenting Plan Order. This Parenting Plan designated Mother as primary residential parent, but allowed Father visitation two weekends per month, specified holidays, and during the bulk of Child's summer vacation. Father timely filed his Notice of Appeal from the August 14, 2007 Parenting Plan.

## II. ISSUES PRESENTED

Appellant has timely filed his notice of appeal and presents the following issues for review:

1.  Whether the trial court erred in modifying the Texas Final Decree absent proof of a material change in circumstances[2] affecting the best interests of the Child;

2.  Whether the trial court erred in making temporary modifications of the Final Decree's custody order absent clear and convincing proof that Child was being harmed, or would be harmed, in the situation that existed at the time such modifications were made;

3.  Whether the trial court erred in finding Father's motives in relocating with Child were "vindictive" and in its concerns about Father's willingness to comply with future court orders or provide for Child.

Additionally, Appellee presents the following issue for review:

4.  Whether Appellee should be awarded reasonable attorney's fees and suit expenses incurred in defending this appeal.

---

[1] This Petition was not included in the Record.

[2] Our courts and the Tennessee General Assembly use the terms "material change in circumstances" and "material change of circumstances" interchangeably. Both refer to the same concept; however, we will use the term "material change in circumstances" in this opinion in accordance with the Tennessee Supreme Court's customary language. *Boyer v. Heimerman*, 238 S.W.3d 249, 255 n.5 (Tenn. Ct. App. 2007).

For the following reasons, we affirm the decision of the circuit court.

### III. STANDARD OF REVIEW

> Although appellate courts are reluctant to second-guess custody decisions when so much depends on the trial court's assessment of the witnesses' credibility, *Nelson v. Nelson*, 66 S.W.3d 396, 901 (Tenn. Ct. App. 2001); *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996), we will reverse or modify a trial court's custody decision if we conclude the decision rests on an error of law, or if the evidence preponderates against the finding that there has or has not been a material change in the child's circumstances or that the child's best interests will be served by changing an existing custody arrangement. *Steen v. Steen*, 61 S.W.3d 324, 328 (Tenn. Ct. App. 2001); *Placencia v. Placencia*, 3 S.W.3d 497, 499 (Tenn. Ct. App. 1999); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997).

**Scofield v. Scofield**, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *2 (Tenn. Ct. App. Feb. 28, 2007).

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2008); **Bogan v. Bogan**, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. **Watson v. Watson**, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the trial court makes no specific findings of fact, we review the record to determine where the preponderance of the evidence lies. **Ganzevoort v. Russell**, 949 S.W.2d 293, 296 (Tenn. 1997) (citing *Kemp v. Thurmond*, 521 S.W.2d 806, 808 (Tenn. 1975)). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. **Union Carbide Corp. v. Huddleston**, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

### IV. DISCUSSION

#### A. Modification of Final Decree

On appeal, Appellant asserts that the circuit court erred in modifying the Texas Final Decree, with respect to custody, without proof that a material change in circumstances, affecting the Child's

best interest, had occurred. "A custody decision, once final, is *res judicata* upon the facts in existence or reasonably foreseeable when the decision was made[.]" **Scofield**, 2007 WL 624351, at *3 (citing *Young v. Smith*, 246 S.W.2d 93, 95 (Tenn. 1952); *Steen*, 61 S.W.3d at 327; *Solima v. Solima*, 7 S.W.3d 30, 32 (Tenn. Ct. App. 1998); *Long v. Long*, 488 S.W.2d 729, 731-32 (Tenn. Ct. App. 1972)). However, because children's and parents' circumstances change, our courts are "empowered to alter custody arrangements when intervening circumstances require modifications." **Id.** (citing Tenn. Code Ann. § 36-6-101(a)(1); *see Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995)). In this case, the trial court made no express finding regarding the threshold determination of whether a material change in circumstance had occurred such that a modification of custody was warranted. Thus, for this issue, we must "conduct our own independent review of the record to determine where the preponderance of the evidence lies." **Cosner v. Cosner**, No. E2007-02031-COA-R3-CV, 2008 WL 3892024, at *3 (Tenn. Ct. App. Aug. 22, 2008) (citing *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Brooks v. Brooks*, 992 S.W.2d 403, 405 (Tenn. 1999); *Devorak v. Patterson*, 907 S.W.2d 815, 818 (Tenn. Ct. App. 1995)).

Modification of an existing custody or visitation arrangement involves a two-step analysis. **See Boyer**, 238 S.W.3d at 255. First, the parent attempting to modify the existing custody or visitation arrangement must prove that a material change in circumstances has occurred. **See Taylor v. McKinnie**, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *3 (Tenn. Ct. App. Aug. 5, 2008) (citing *Kendrick*, 90 S.W.3d at 570 (Tenn. 2002)). "[N]ot all changes in the circumstances of the parties and the child warrant a change in custody." **Cosner**, 2008 WL 3892024, at *4. "There are no hard and fast rules for when there has been a change of circumstances sufficient to justify a change in custody." **Id.** (citing *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003)). However, to determine whether a material change in circumstances has occurred, the court should consider whether: "(1) the change occurred after the entry of the order sought to be modified; (2) the changed circumstances were not reasonably anticipated when the underlying decree was entered, and (3) the change is one that affects the child's well-being in a meaningful way." **Id.** at *4 (citing *Kendrick*, 90 S.W.3d at 570; *Blair v. Badenhope*, 77 S.W.3d 137 (Tenn. 2002); *Cranston*, 106 S.W.3d at 644). "Custody decisions are not intended and should not be designed to reward parents for prior virtuous conduct, nor to punish them for their human frailties or past missteps." **Id.** (citing *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006); *Kesterson v. Varner*, 172 S.W.3d 556, 561 (Tenn. Ct. App. 2005); *Oliver v. Oliver*, No. M2002-02880-COA-R3-CV, 2004 WL 892536, at *2 (Tenn. Ct. App. Apr. 26, 2004); *Earls v. Earls*, 42 S.W.3d 877, 885 (Tenn. Ct. App. 2000)).

If the petitioner makes a prima facie case of a material change in circumstances, then the court must determine whether a change in custody is in the best interest of the child. **In re J.C.S.**, No. M2007-02049-COA-R3-PT, 2008 WL 2924982, at *6 (Tenn. Ct. App. July 28, 2008). This determination requires consideration of a number of factors, including those set forth in Tennessee Code Annotated section 36-6-106 to make an initial custody determination, and Tennessee Code Annotated section 36-6-404 to fashion a residential schedule. **Id**.

Mother contends that she "is at a loss to see why [Father is arguing that no material change in circumstances occurred] since Father admits in his brief that he, too, petitioned the court for a

modification and alleged a material change of circumstances, warranting modification of the parenting plan." However, Father's Reply Brief correctly points out that his Petition for Contempt, Motion to Dismiss, and Petition to Modify Final Decree of Divorce as to Parenting Time states that "Mother's willful contempt . . . constitutes a material change in circumstances, warranting modification of the *parenting schedule*." (emphasis added). A 2004 amendment to Tennessee Code Annotated section 36-6-101(a)(2) differentiated between modification of a custody decree–change of "primary residential parent"– and modification of a parenting plan–change of schedule. ***Scofield***, 2007 WL 624351, at \*3. Prior to the amendment, the showing of a material change in circumstances was the same for both modifications of custody and parenting plans.[3] ***See id.*** However, after the amendment, the statute reads:

> (B) **If the issue before the court is a modification of** the court's prior decree pertaining to **custody**, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

**Tenn. Code Ann. § 36-6-101(a)(2)(B) (Supp. 2008)** (emphasis added). In 2004, a new subsection concerning modification of a residential parenting schedule was also added:

> (C) **If the issue before the court is a modification of** the court's prior decree pertaining to **a residential parenting schedule**, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan;

---

[3] Prior to the 2004 amendment, the statute with the now deleted language italicized, read:

(B) If the issue before the court is a modification of the court's prior decree pertaining to custody language *or a residential parenting arrangement*, the petitioner must prove by a preponderance of the evidence a material change of circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child. ***Id.*** (quoting Tenn. Code Ann. § 36-6-101(a)(2)(B)(2003) (emphasis added)).

or other circumstances making a change in the residential parenting time in the best interest of the child.

**Tenn. Code Ann. § 36-6-101(a)(2)(C) (Supp. 2008)** (emphasis added).

"As a result of the 2004 amendment, Tennessee now has a different set of criteria for determining whether a material change of circumstance has occurred to justify a modification of a 'residential parenting schedule' and the specifics of such a schedule." *Scofield*, 2007 WL 624351, at *3. "The amendment, specifically the addition of subsection (a)(2)(C), establishes different criteria and a lower threshold for modification of a residential parenting schedule." *Id.* (citing *Rose v. Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2, n.3 (Tenn. Ct. App. Aug. 18, 2006) (holding that Tennessee Code Annotated section 36-6-101(a)(2)(C) "sets a very low threshold for establishing a material change of circumstances")). Thus, we find Father's contention that a material change in circumstances existed to warrant a modification of the *parenting schedule* does not preclude him from arguing, to this Court, that no material change in circumstances existed, such that a modification of *custody* was appropriate.

As we noted above, the trial court provided no findings of fact concerning whether a material change in circumstances occurred, as required under Tennessee law to modify the current custody arrangement. Therefore, we must "conduct our own independent review of the record to determine where the preponderance of the evidence lies." *Cosner v. Cosner*, No. E2007-02031-COA-R3-CV, 2008 WL 3892024, at *3 (Tenn. Ct. App. Aug. 22, 2008) (citing *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Brooks v. Brooks*, 992 S.W.2d 403, 405 (Tenn. 1999); *Devorak v. Patterson*, 907 S.W.2d 815, 818 (Tenn. Ct. App. 1995)). Mother's appellate brief, in addition to her argument that Father acknowledged a material change in circumstances had occurred, points to four material change in circumstances.

First, Mother contends that Father "refus[ed] to follow the Texas court's order and enter counseling with Mother to resolve some of the conflicts that existed." However, the trial court acknowledged that "[Father's failure to submit to a psychological evaluation] couldn't have been the basis for [Mother's] filing because it hadn't been ordered at the time."

Second, Mother alleges, as a material change in circumstances, that "the minor Child showed substantial developmental delays and behavioral problems while living primarily with Father which Father failed to address." More specifically, Mother alleges that Father failed to report recognition of Child's delayed speech. According to Dr. Steinberg's March 8, 2005 Child Custody and Visitation Evaluation ("Evaluation"), the Child "has a speech delay that affects communication socialization. . . . [which] was unforeseen by the original Texas Court." The Evaluation further reports that "[Mother] appears to have a consciousness about this speech delay and [an] initial plan for addressing it[; however,] [t]here does not appear to be such a consciousness and plan on

-7-

[Father's] part." Dr. Steinberg noted that "[t]his may constitute [a] substantial material change of circumstances affecting [the Child] for the Court to consider, that the Texas Court had not anticipated."

Third, Mother claims that "changes in Father's mental and physical health since entry of the [Final] [D]ecree" constitute a material change of circumstance. Concerning Father's mental health, Mother stated that "Father has exhibited bizarre behavior" and "demonstrated uncontrolled physical outbursts in open court." However, Father's appellate brief also points to testimony wherein a number of witnesses described Mother's verbally abusive conduct during exchanges of the Child. Regarding Father's physical health, Mother testified that she "definitely speculate[d] that in addition to [Father's] current significant obesity that we know contributed to [his] blood clots, that [Father] is hypertensive[,] [and that she] would not be shocked if [Father] has issues with his glucose levels or any of his lipids, . . . . [or] at least hyperlipidemia[.]" Mother also testified that Father was using a handicap placard and "was probably likely prescribed . . . medication . . . . [following knee] surgery[.]" However she acknowledged that, because Father would not release his medical records, Mother could not "confirm" the existence of these conditions, but could only state "that those are very likely medical issues that he is currently addressing[.]"

Finally, Mother argues that Dr. Steinberg's Evaluation "found changes in circumstances which supported the need to modify the current parenting plan." According to Dr. Steinberg, the "assessment [of Mother and Father] . . . show[ed] that there may have been substantial changes in circumstance for the Court to consider in several areas ultimately affecting [the Child] that were unforeseen when [Father] gained custody." Dr. Steinberg stated that Father had an "apparent agenda of continued conflict non-resolution[,]" as evidenced by his refusal to comply with the custody evaluation. He also stated that:

> [Father's] agenda appears to support the minimization of [Mother's] involvement. In his legal maneuvering in Texas, [Father] noted twelve violations of Court order, and requested that [Mother] be jailed for up to 180 days consecutively for each violation. If the Court had granted [Father's] request, [the Child] would have been meaningfully separated from his mother. This is consistent with [Father's] personal agenda during his conflict with [Mother] supplanting what is in the best interest of [the Child].

However, Dr. Steinberg's Evaluation also reported that "[n]either parent appears to be behaviorally facilitating or encouraging a close and continuing parent-child relationship with the other respective parent, with the exception of [Mother] having a picture of [Father] in [the Child's] bedroom in her home."

Based on the factors this Court is required to consider in determining whether a material change in circumstances has occurred–the threshold issue in a modification of a custody or visitation arrangement–we find that Mother made out a prima facie case of a material change in circumstances. Dr. Steinberg's Evaluation evidences at least two compelling material changes in circumstance that arose subsequent to the entry of the Final Decree. Both Dr. Steinberg's Evaluation findings that Father exhibited a personal agenda aimed at minimizing Mother's involvement with the Child and failing to resolve the conflict that exists between Mother and Father, along with the development of speech delays by the Child, which Father failed to address, evidence changes that "affect[] the child's well-being in a meaningful way." *Cosner*, 2008 WL 3892024, at \*4.

Having found a material change in circumstances, we must now determine whether the trial court's modification of the Final Decree, designating Mother as the primary residential parent, was in the best interest of the Child. Again, because the trial court failed to expressly find that such a modification was in the best interest of the Child,[4] we review the evidence *de novo* to determine where the preponderance of the evidence lies. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997) (citing *Kemp v. Thurmond*, 521 S.W.2d 806, 808 (Tenn. 1975)).

Based on the factors outlined in Tennessee Code Annotated sections 36-6-106 and 36-6-404(b), we find that the trial court's designation of Mother as the primary residential parent was in the Child's best interest. In so finding, we note at least two factors which preponderate in favor of Mother acting as primary residential parent: (1) "The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child; [and (2)] The emotional needs and developmental level of the child[.]" **Tenn. Code Ann. § 36-6-404(b)(3), (8) (2005)**.

### B. Temporary Modification

Second, Appellant argues that the trial court erred in making temporary modifications to the Final Decree absent clear and convincing evidence that the Child was being harmed, or would be harmed, in the situation that existed at the time such modifications were made. Mother's appellate brief argues that Appellant may not raise this issue on appeal, as he failed to raise it before the trial court, citing *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991) (stating that "issues not raised in the trial court cannot be raised for the first time on appeal"). Appellant's reply brief does not contend that Appellant raised the issue before the trial court, but instead attempts to distinguish *Simpson* from the instant case. Appellant argues that in *Simpson*, the plaintiff employee argued for the first time on appeal that the trial court erred in awarding attorney's fees based solely on his permanent disability award, excluding his total disability award, medical

---

[4]The trial court did expressly consider the Child's best interest in its April 24, 2006 Order modifying the prior temporary parenting plan, such that each parent was afforded parenting time with the Child on six-month intervals. However, in adopting the permanent Parenting Plan Order, the court did not expressly engage in a best interest analysis.

expenses, and mileage expenses. *Simpson*, 810 S.W.2d at 153. Whereas here, Appellant claims he "is not requesting 'relief' from this Court that he failed to request at trial, but simply arguing . . . that the trial court's temporary modifications of custody order were without sufficient proof and, therefore, outside its authority to grant."

We do not reach the issue of whether the Appellant's claim must have been raised before the trial court, as we find the correctness of the temporary modifications moot. Because a permanent parenting plan order has been rendered in this case, a finding that the temporary modifications were incorrectly made would afford Appellant no relief. Thus, we will not address whether the trial court erred in making temporary modifications to the Final Decree. ***See McIntyre v. Traughber***, 884 S.W.2d 134, 137 (Tenn. Ct. App. 1994) ("A case will generally be considered moot if it no longer serves as a means to provide relief to the prevailing party."). ***Id.*** (citations omitted).

## C.   Relocation

Finally, Appellant contends that "[t]he trial court erred in finding [] Father's motives for relocating with the [] Child were vindictive and in its concerns about Father's willingness to comply with future court orders or provide for the child." Because these were factual findings made by the trial court, we must presume their correctness and cannot overturn them unless the evidence preponderates against them. **Tenn. R. App. P. 13(d) (2008)**; ***Bogan v. Bogan***, 60 S.W.3d 721, 727 (Tenn. 2001).

### 1.   Vindictiveness

We first address Father's contention that the trial court erred in finding his motive for relocation vindictive. Tennessee Code Annotated section 36-6-108(d)(1), concerning parental relocation, provides, in part:[5]

> The parent spending the greater amount of time with the child shall be permitted to relocate with the child unless the court finds:

> (C) The parent's motive for relocating with the child is vindictive in that it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child.

In support of its finding that Father's decision to relocate to Washington, D.C. was vindictive, the court noted that:

> (A) Father indicated several times that he never intended to live in the same city with the child and Mother[;]

---

[5] Although Mother and Father were sharing substantially equally parenting time during the pendency of the proceedings, the trial court reviewed the relocation as if Father was exercising greater parenting time, as the substantially equal parenting time resulted from the trial court's intervention.

(B) The Texas decree ordered that Memphis/Shelby County, Tennessee, should be the home for Father and the minor child[; and]

(C) Father indicated that he had chosen to be a stay-at-home dad in Memphis and then secured full-time employment in Washington, D.C.

However, Father argues that rather than showing any vindictive nature, the facts surrounding his decision to relocate are similar to those in *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 487 (Tenn. Ct. App. 1997), in which we overruled the trial court's finding of vindictiveness. In *Adelsperger* the mother was awarded sole custody of the divorcing parties' three minor children. *Adelsperger*, 970 S.W.2d at 483. During the parties' divorce the mother assured the trial court that "she had no present intention to move and that [the father's] visitation with the children was important to her[;]" however, six months after the divorce, she moved from Murfreesboro to Mississippi. *Id.* In reversing the trial court, we noted that "the circumstances surrounding [the mother's] jobs are more consistent with the circumstances facing many newly single parents rather than with a conclusion that [mother] has acted irresponsibly during the divorce." *Id.* at 486. Likewise, we found that the mother's "decision to accept [the] job [in Mississippi was not] an indication that she had been untruthful when she told the trial court . . . that she was not planning to move back to Mississippi." *Id*. In *Adelsperger*, the mother initially changed jobs in Tennessee when her former employer was acquired by another company. *Id.* She then began working for a car dealership expecting to work normal business hours, but was forced to work six days per week, with one weekday off, and occasionally was required to work at night.[6] *Id.* Although she asked the father for help with the children, he never provided any assistance. *Id.* Thus, when she received a job offer from a trucking company near her family's home in Mississippi, offering a higher salary and more regular working hours, she decided to relocate to Mississippi, where she could receive support from her family. *Adelsperger*, 970 S.W.2d at 483-84. After the move, the mother drove the children to Murfreesboro every other weekend because the father refused to meet the mother somewhere along the route. *Id.* at 484.

We find *Adelsperger* distinguishable from the instant case. Unlike in *Adelsperger*, here Father "indicated several times that he never intended to live in the same city with the [C]hild and Mother." Likewise, Father seemingly made few, if any, serious attempts to secure employment in Memphis. Although he claims to have applied for teaching jobs in Memphis, he was unable to recall any place to which he applied. Thus, we find that the evidence does not preponderate against the trial court's finding of vindictiveness.

## 2. Compliance

---

[6] The mother applied for the job at the trucking company in Mississippi at the same time she applied for the job with the car dealership in Tennessee. When she obtained the Tennessee job, she ceased pursuing the Mississippi job until she discovered the work schedule was not as expected. *Adelsperger*, 970 S.W.2d at 486.

Father also contends that the trial erred in its "concerns as to whether Father, once out of the jurisdiction, would be likely to comply with any new visitation arrangement." Although, in this contentious divorce, both Parties testified to numerous parenting schedule violations by the other Party, we find that the evidence does not preponderate against the trial court's finding. Particularly, we note Dr. Steinberg's findings that Father has a "personal agenda toward [Mother] supplanting what is in the best interest of the [C]hild[,]" an "agenda . . . to support the minimization of [Mother's] involvement[,]" and an "apparent agenda of continued conflict non-resolution [with Mother.]"

### 3. Ability to Provide for Child

Finally, Father contends that the trial court erred in finding "concern[] about Father's ability to provide for the child since he has lived with Father's mother during the pendency of these proceedings prior to relocating." Our review of the record reveals a sparse employment history prior to Father's current employment with the FBI. According to Dr. Steinberg's Evaluation, Father "stated that he was unemployed from . . . February 2002 until . . . [the Child] was born on October 1, 2002." Father explained that he underwent surgery around September or October of 2002 to repair a ruptured quadriceps tendon. According to Father's mother, this surgery left Father unable to walk for one year. During that period, Father's mother "wait[ed] on [Father] hand and foot." After Father received custody of the Child in July 2003, both Father and the then nine month old Child lived with Father's mother in her home. Apparently, from July 2003 until Father's move to Washington, D.C. in December 2005, Father's mother "paid all of the house bills, [and] kept everything up in the home[,]" in order that Father could stay at home with the Child. Father's mother even stated that she "would work three or four, even five jobs in order for [Father] to stay at home." This occurred despite Father's testimony that in late October 2003, when he was "given the clearance to go to normal activities[,]" he began working part-time at Kaplan Educational Services where he earned $20 per hour. Although Father originally worked twenty hours per week, he asserts that he reduced his hours to six to twelve hours per week, in order to be present when the Child was exchanged with Mother. Despite this poor work history, the record reflects a substantial improvement in Father's employment status. On February 20, 2006, Father testified about a turnaround in his employment outlook; he stated that since December 2005 he had been employed by the FBI in Washington, D.C., on a full-time basis, as a financial analyst earning $50,985.00 per year, along with $10,000 annually toward repayment of his student debt. Based on Father's position with the FBI, we find that the evidence preponderates against the trial court's "concern[] about Father's ability to provide for the child." However, in so finding, we do not reverse the trial court's ultimate finding that relocation was not in the Child's best interest, as the court's concern about Father's ability to provide for the Child was only one of at least seven factors the court considered in making its ruling.

### D. Attorney's Fees

Appellee asks this Court to award her reasonable attorney's fees and suit expenses incurred in defending Appellant's appeal. "Attorney's fees are only awarded if provided for by contract,

-12-

statute, or a recognized ground of equity." ***Parchman v. Parchman***, No. W2003-01204-COA-R3-CV, 2004 Tenn. App. LEXIS 768, at *15 (Tenn. Ct. App. Nov. 17, 2004) (quoting *Austin Powder Co. v. Thompson*, No. 03A01-9607-CV-00229, 1996 Tenn. App. LEXIS 805, at *5 (Tenn. Ct. App. Dec. 16, 1996)).

Appellee has not requested attorney's fees for frivolous appeal pursuant to section 27-1-122 of the Tennessee Code. Instead, it appears Appellee's request is based on the fact that this is a divorce case. "The decision of whether to award attorney's fees on appeal rests solely within the discretion of this Court." *Id.* at *15-16 (citing Tenn. Code Ann. § 36-5-103(c) (2003); *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). As such, when this Court considers whether to award attorney's fees on appeal, we must be mindful of "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered." ***Dulin v. Dulin***, No. W2001-02969-COA-R3-CV, 2003 Tenn. App. LEXIS 628, at *26-27 (Tenn. Ct. App. Sept. 3, 2003) (citing ***Folk v. Folk***, 210 Tenn. 367, 357 S.W.2d 828, 829 (Tenn. 1962)); ***see also Parchman***, 2004 Tenn. App. LEXIS 768 at *15-16. In this case, we find it equitable to decline to award Appellee attorney's fees on appeal.

## V.   CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court. Further, we decline to award attorney's fees to Appellee. Costs of this appeal are taxed to Appellant, Nicholas J. Blakes, for which execution may issue if necessary.

ALAN E. HIGHERS, P.J., W.S.

-13-